*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SCHOOL DISTRICT OF THE CITY OF PONTIAC, et al.,
　　　　　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

SECRETARY OF THE UNITED STATES DEPARTMENT
OF EDUCATION,

　　　　　　　　　　*Defendant-Appellee.*

No. 05-2708

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-71535—Bernard A. Friedman, Chief District Judge.

Argued: November 28, 2006

Decided and Filed: January 7, 2008

Before: COLE and McKEAGUE, Circuit Judges; BREEN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Robert H. Chanin, BREDHOFF & KAISER, Washington, D.C., for Appellants. Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert H. Chanin, Alice Margaret O'Brien, Jeremiah A. Collins, BREDHOFF & KAISER, Washington, D.C., Dennis R. Pollard, THRUN LAW FIRM, Bloomfield Hills, Michigan, for Appellants. Alisa B. Klein, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Joseph M. Miller, PENNSYLVANIA DEPARTMENT OF EDUCATION, Harrisburg, Pennsylvania, Kari Krogseng, James C. Harrison, REMCHO, JOHANSEN & PURCELL, San Leandro, California, Gene C. Lange, LUMAN, LANGE, THOMAS & McMULLEN, Washington, D.C., Richard Blumenthal, ATTORNEY GENERAL OF THE STATE OF CONNECTICUT, Hartford, Connecticut, for Amici Curiae.

　　　COLE, J., delivered the opinion of the court, in which BREEN, D. J., joined. McKEAGUE, J. (pp. 19-29), delivered a separate dissenting opinion.

---

[*] The Honorable J. Daniel Breen, United States District Judge for the Western District of Tennessee, sitting by designation.

———————————

**OPINION**

———————————

R. GUY COLE, Jr., Circuit Judge.  This case requires us to decide a fundamental question of federal versus state funding under the No Child Left Behind Act of 2001 ("NCLB" or "the Act"), 20 U.S.C. §§ 6301–7941.  Plaintiffs-Appellants are school districts and education associations that receive federal funding under NCLB in exchange for complying with the Act's various educational requirements and accountability measures.  Based on the so-called "Unfunded Mandates Provision," which provides that "[n]othing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act," 20 U.S.C. § 7907(a), Plaintiffs filed suit in district court against the Secretary of Education seeking, among other relief, a judgment declaring that they need not comply with the Act's requirements where federal funds do not cover the increased costs of compliance.  The district court concluded, however, that Plaintiffs must comply with the Act's requirements regardless of any federal-funding shortfall and accordingly granted the Secretary's motion to dismiss the complaint for failure to state a claim upon which relief can be granted.  Because statutes enacted under the Spending Clause of the United States Constitution must provide clear notice to the States of their liabilities should they decide to accept federal funding under those statutes, and because we conclude that NCLB fails to provide clear notice as to who bears the additional costs of compliance, we **REVERSE** the judgment of the district court and **REMAND** this case for further proceedings consistent with this opinion.

**I.  BACKGROUND**

**A.  The No Child Left Behind Act**

On January 8, 2002, President George W. Bush signed into law the No Child Left Behind Act.  The Act—a comprehensive, and in some quarters controversial, educational reform—amended the Elementary and Secondary Education Act of 1965 ("ESEA"), Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. §§ 6301–7941 (2003)).  *See Connecticut v. Spellings*, 453 F. Supp. 2d 459, 468 (D. Conn. 2006).  The ESEA targeted funding to students in low-income schools, and its purposes included overcoming "any effects of past racial discrimination." *George v. O'Kelly*, 448 F.2d 148, 151 (5th Cir. 1971); *accord Barrera v. Wheeler*, 475 F.2d 1338, 1340 (8th Cir. 1973); *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 851 (5th Cir. 1966).  The ESEA was periodically reauthorized and amended over the next few decades.

In contrast to prior ESEA iterations, NCLB "provides increased flexibility of funds, accountability for student achievement and more options for parents."  147 Cong. Rec. S13365, 13366 (2001) (statement of Sen. Bunning).  The Act focuses federal funding more narrowly on the poorest students and demands accountability from schools, with serious consequences for schools that fail to meet academic-achievement requirements.  *Id.* at 13366, 13372 (statements of Sens. Bunning, Landrieu, and Kennedy).  States may choose not to participate in NCLB and forego the federal funds that accompany the Act.  If they do accept the funds, they must comply with NCLB requirements. *See, e.g.*, 20 U.S.C. § 6311 ("For any State *desiring* to receive a grant under this part, the State educational agency shall submit to the Secretary a plan . . . .") (emphasis added); *see also Spellings*, 453 F. Supp. 2d at 469 ("In return for federal educational funds under the Act, Congress imposed on states a comprehensive regime of educational assessments and accountability measures.").

Title I, Part A, of NCLB, titled "Improving Basic Programs Operated by Local Educational Agencies," continues to pursue the objectives of the original ESEA and imposes the most extensive

educational requirements on participating States and school districts, and likewise provides the largest amount of federal appropriations to participating States. For example, in 2005–06, NCLB authorized $22.75 billion in appropriations for Title I, Part A, compared to $14.1 billion for the remaining 26 parts of NCLB combined. Title I, Part A's stated purposes include meeting "the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance." 20 U.S.C. § 6301(2).

In addition to Title I, Part A, NCLB establishes numerous other programs, including a literacy initiative for young children and poor families (Title I, Part B); special services for the education of children of migrant workers (Title I, Part C); requirements that all teachers be "highly qualified" (Title II, Part A); and instruction in English for children with limited English ability (Title III). Plaintiffs' complaint focuses on the educational requirements and funding provisions of Title I, Part A.

To qualify for federal funding under Title I, Part A, States must first submit to the Secretary a "State plan," developed by the state department of education in consultation with school districts, parents, teachers, and other personnel. *Id.* § 6311(a)(1). A State plan must "demonstrate that the State has adopted challenging academic content standards and challenging student academic achievement standards" against which to measure the academic achievement of the State's students. *Id.* § 6311(b)(1)(A). The standards in the plan must be uniformly applicable to students in all the State's public schools, and must at least cover reading, math, and science skills. *Id.* § 6311(b)(1)(C).

States must also develop, and school districts must administer, assessments to determine students' levels of achievement under plan standards. *Id.* § 6311(b)(2)(A). These assessments must be able to show the percentage of students achieving proficiency among "economically disadvantaged students," "students from major racial and ethnic groups," "students with disabilities," and "students with limited English proficiency." *Id.* § 6311(b)(2)(C)(v)(II). Schools and districts are responsible for making "adequate yearly progress" ("AYP") on these assessments, meaning that a minimum percentage of students, both overall and in each subgroup, attains proficiency. 34 C.F.R. § 200.20(a)(1).

Failure of a school to make AYP triggers other requirements of Title I, Part A. If a school fails to make AYP for two consecutive years, it must be identified by the local educational agency for school improvement. 20 U.S.C. § 6316(b)(1)(A). Among other things, a school in improvement status must inform all of its students, including those who have been assessed as proficient, that they are permitted to transfer to any school within the district that has not been identified for school improvement. *Id.* § 6316(b)(1)(E)(i). The school must also develop a two-year plan setting forth extensive measures to improve student performance, including further education for teachers and possible before- or after-school instruction, or summer instruction. *Id.* §§ 6316(b)(3)(A)(iii), (ix).

If a school does not make AYP after two full years of improvement status, it is "identif[ied] . . . for corrective action." *Id.* § 6316(b)(7)(C)(iv). Corrective action involves significant changes, such as replacing teachers who are "relevant to the failure to make [AYP]," or instituting an entirely new curriculum. *Id.* If after a full year of corrective action a school has still not made AYP, the district must restructure the school entirely; options for restructuring include "[r]eopening the school as a public charter school," replacing the majority of the staff, or letting the State's department of education run the school directly. *Id.* § 6316(b)(8)(B).

With enumerated exceptions, under NCLB "the Secretary may waive any statutory or regulatory requirement . . . for a State educational agency, local educational agency, Indian tribe,

or school through a local educational agency, that . . . receives funds under a program authorized by this Act."  20 U.S.C. § 7861(a).

NCLB also requires that States use federal funds made available under the Act "only to supplement the funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under this part, and not to supplant such funds."  20 U.S.C. § 6321(b)(1).  That is, States and school districts continue to be responsible for the majority of the funding for public education and the funds distributed under Title I should be used only to implement Title I programming, not as a substitute to the funds that are already being used for general programming.[1]

However, while Plaintiffs recognize that the majority of the funding for education continues to come from state and local sources, the Plaintiffs contend that NCLB does not require them to spend the money drawn from state and local sources on the additional programs created as required by NCLB.  At the heart of this case is § 7907(a), often referred to as the "Unfunded Mandates Provision," which Plaintiffs argue provides that they need not comply with the Act's requirements where federal funding does not cover the additional costs of complying with those requirements.  Section 7907 is entitled "Prohibitions on Federal government and use of Federal funds," and subsection 7907(a) provides as follows:

> General prohibition.  Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof *to spend any funds or incur any costs not paid for under this Act*.

20 U.S.C. § 7907(a) (emphasis added).  Plaintiffs note that former Secretary of Education Rod Paige has explained that "[t]here is language in the bill that *prohibits requiring anything that is not paid for*."  (Joint Appendix ("JA") 21 (quoting Paige statement of Dec. 2, 2003) (emphasis added).)

## B.  Procedural History

As mentioned, Plaintiffs-Appellants are school districts and education associations.  The eight school districts are Pontiac School District, Laredo Independent School District, Leicester Town School District, Neshobe Elementary School District, Otter Valley Union High School, Pittsford Town School District, Sudbury Town School District, and Whiting Town School District.  Rutland Northeast Supervisory Union, which contains eleven school districts, is also a Plaintiff-Appellant.  The education association Plaintiffs-Appellants are the National Education Association (NEA) and ten NEA-affiliate education associations:  the Connecticut Education Association, the Illinois Education Association, the Michigan Education Association, the Ohio Education Association, the Reading Education Association, the Utah Education Association, the Indiana State Teachers Association, the Texas State Teachers Association, NEA-New Hampshire, and the Vermont NEA.

Plaintiffs brought suit in the United States District Court for the Eastern District of Michigan against the Secretary, alleging, based on § 7907(a), that the Act does not require school districts to

---

[1]Contrary to the dissent's contention that victory by the Plaintiffs in this case will result in a fundamental change in this nation's funding scheme for education, the Plaintiffs do not argue that the funds distributed by NCLB are a substitute for those funds that have historically come from state and local sources.  Instead, Plaintiffs argue only that they should not be required to incur additional funding obligations—those necessary to comply with NCLB that would not be incurred absent the State's attempt at compliance with NCLB.

comply with NCLB educational requirements if doing so would require the expenditure of state and local funds to cover the additional costs of compliance. (*See, e.g.*, Plaintiffs Reply Br. 6 ("Plaintiffs' position is simply that the Secretary may not require states and school districts to take actions mandated by the NCLB that the states and school districts would not undertake absent the NCLB's mandates, if doing so would require the states or school districts 'to spend any funds or incur any costs not paid for under [the NCLB].'") (alteration in original).)  The complaint alleged in the alternative that the Act is ambiguous regarding whether school districts are required to spend their own funds, and that imposing such a requirement would therefore violate the Spending Clause of the United States Constitution.

Plaintiffs alleged that in the years following the enactment of NCLB, Congress has not provided States and school districts with sufficient federal funds to comply fully with the Act.  For example, for the five years from fiscal year 2002 to fiscal year 2006, Congress appropriated $30.8 billion dollars less for Title I grants to school districts than it authorized in NCLB. (JA 27.)  Plaintiffs sought a declaratory judgment to the effect that "states and school districts are not required to spend non-NCLB funds to comply with the NCLB mandates, and that a failure to comply with the NCLB mandates for this reason does not provide a basis for withholding any federal funds to which they otherwise are entitled under the NCLB." (JA 67.)  Plaintiffs also sought an injunction prohibiting the Secretary from "withholding from states and school districts any federal funds to which they are entitled under the NCLB because of a failure to comply with the mandates of the NCLB that is attributable to a refusal to spend non-NCLB funds to achieve such compliance." (*Id.*)

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  The district court focused on the first part of § 7907(a), which, for clarity, we restate in full below:

> General prohibition.  Nothing in this Act shall be construed to authorize *an officer or employee* of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act.

20 U.S.C. § 7907(a) (emphasis added).  The court concluded that "[b]y including the words 'an officer or employee of,' Congress clearly meant [merely] to prohibit federal officers and employees from imposing additional, unfunded requirements, beyond those provided for in the statute." *Sch. Dist. of Pontiac v. Spellings*, No. 05-CV-71535, 2005 U.S. Dist. LEXIS 29253, at *12 (E.D. Mich. Nov. 23, 2005). "This does not mean," the court explained, "that *Congress* could not [require States or school districts to spend any funds or incur any costs not paid for under this Act], which it obviously has done by passing the NCLB Act." *Id.* at *11 (emphasis in original).  In other words, the district court read § 7907(a) merely to prohibit federal officers and employees from imposing requirements that were not authorized by the Act on States and school districts.  The district court rejected Plaintiffs' argument that § 7907(a) excuses compliance with requirements of the Act that impose additional costs on the States not funded by the federal government.

Plaintiffs appealed.

## II.  DISCUSSION

A threshold question is whether this case is properly before us.  Although the parties litigated standing in the district court, which concluded that Plaintiffs had standing, neither party has addressed the issue on appeal.  We must, however, address standing where it is in question, even if the parties have not raised the issue. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110

(2001) ("We are obliged to examine standing *sua sponte* where standing has erroneously been assumed below."). Accordingly, we first address whether Plaintiffs have standing, and then—after answering that question in the affirmative—conclude that they have stated a claim upon which relief can be granted based on § 7907(a) in light of the Supreme Court's Spending Clause jurisprudence.

## A.    Standing

We review de novo the question of standing. *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). "[P]laintiffs, as the parties now asserting federal jurisdiction," have the burden of establishing standing. *DaimlerChrysler Corp. v. Cuno*, __ U.S. __, 126 S. Ct. 1854, 1861 (2006). To satisfy the constitutional requirement of standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The injury suffered must be "an invasion of a legally protected interest." *United States v. Hays*, 515 U.S. 737, 743 (1995). This tripartite standing requirement is applicable to claims under NCLB. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citing *Lujan*, 504 U.S. at 560–61).

Here, because the complaint was dismissed at the pleading stage, the assessment of standing is confined to the allegations in the complaint. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"; more is required to defeat a motion for summary judgment and yet more for a decision on the merits. *Lujan*, 504 U.S. at 561.

As discussed below, the Plaintiff school districts meet the three requirements for standing based on their allegation that they must spend state and local funds to pay for NCLB compliance. Since at least one Plaintiff in this action has standing, there is no need to consider whether the education association Plaintiffs also have standing. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 431 (1998); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). Additionally, we need not address whether Plaintiff school districts' other alleged injuries are sufficient to establish standing. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004) (finding standing where, although one alleged injury might not occur "for thousands of years," another injury would allegedly occur very soon).

### 1.    *Injury in Fact*

Plaintiff school districts, and the supervisory union, allege that they must spend state and local funds to pay for NCLB compliance:

> Because of the multi-billion dollar national funding shortfalls of NCLB, and the insistence by [the Secretary] that . . . school districts comply fully with all of the NCLB mandates imposed upon them even if NCLB funds that they receive are insufficient to pay for such compliance, . . . school districts have had and will have to spend a substantial amount of non-NCLB funds to comply with those mandates, diverting those funds from other important educational programs and priorities, such as programs for gifted and talented students, courses in foreign languages, art, music, computers, and other non-NCLB subjects, class size reduction efforts, and extracurricular activities.

(JA 61–62.)  The districts also allege that if they do not comply with all NCLB requirements, including those whose costs exceed NCLB funding, the districts "face the withholding [by the Secretary] of federal funds to which they otherwise are entitled under the NCLB."  (JA 65.) Additionally, the districts claim that inadequate federal funding has caused low rates of student proficiency on standardized tests.

The current Secretary has consistently maintained that school districts must comply with NCLB requirements even if they must spend non-federal funds to do so.  Plaintiffs contend that, based on 20 U.S.C. § 7907(a), NCLB does not require compliance beyond that for which federal funds will pay.  Plaintiff districts allege that the Secretary's insistence that school districts comply fully with NCLB has already forced Plaintiffs to spend state and local funds on NCLB requirements and will continue to require such expenditures in the future.  Because this injury has already occurred and is ongoing, it is concrete and actual.

Moreover, the alleged ongoing need of Plaintiff districts to spend non-federal funds to comply with NCLB requirements is not dependent on the hypothetical actions of "decisions made by the appropriate [state] authorities, who are not parties to this case." *Warth v. Seldin*, 422 U.S. 490, 509 (1975) (holding that city of Rochester taxpayers could not sue the town of Penfield on the theory that Penfield's zoning practices would increase Rochester taxes, because Rochester was not a party).  That is, under NCLB, States do not have the discretion to decide that in the event of a federal-funding shortfall some districts will continue to receive their previous level of funding and others will not.  Instead, under NCLB, state departments of education "shall" allocate federal NCLB funds to counties or school districts based on formulas provided in NCLB and approved by the Secretary.  20 U.S.C. § 6333(a)(3).  Thus, the "injury in this case . . . does not turn on the independent actions of third parties," but on NCLB's funding requirements, which dictate the quantum of funding provided to each school district. *Clinton*, 524 U.S. at 431 n.19.  To the extent the funding received by Plaintiff districts under NCLB is insufficient to defray the cost of compliance with NCLB requirements, the districts have sustained a cognizable injury in fact.

2.      *Traceability*

The requirement that Plaintiff districts spend non-federal funds to comply with NCLB is also fairly traceable to the challenged action of the Secretary.  The Secretary has interpreted NCLB to mean that "'[i]f a state decides to accept the federal funds [offered under the NCLB], then it's required to implement the law in its entirety.'" (JA 21 (quoting Rodney Paige, Secretary, U.S. Dep't of Educ., Remarks to National Urban League (Mar. 25, 2004)) (alterations in original).)  Thus, the Secretary has not granted waivers of NCLB educational requirements based on the insufficiency of federal funding.[2]  Therefore, Plaintiff districts allege, they have spent non-federal funds to comply with NCLB requirements. If the Secretary were not enforcing compliance with NCLB requirements even when federal funds do not pay for compliance, school districts would either not have to spend these funds at all, or would be able to spend them on other educational initiatives they believe are important.

---

[2]Due to the Secretary's uniform rejection of requests for waivers, Plaintiffs allege that "it would be futile for the plaintiff school districts to ask" for a waiver.  (JA 22–23.)  The Secretary does not dispute that a request would be futile, and neither party has addressed the exhaustion of administrative remedies. *See* 20 U.S.C. § 1234d (providing an opportunity for an administrative hearing before the Secretary withholds federal education funds); *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (providing a narrow exception to the exhaustion requirement); *Spellings*, 453 F. Supp. 2d at 485 (requiring that a plaintiff challenging NCLB exhaust administrative remedies first).  Therefore, we will not address the significance of the failure to exhaust such remedies at this stage in the litigation.

3.       *Redressability*

Finally, Plaintiff districts' injury must be redressable by a favorable decision. Among other relief, Plaintiffs seek a declaratory judgment that "school districts are not required to spend non-NCLB funds to comply with the NCLB mandates." (JA 67.) Such a judgment would forbid the Secretary from requiring the expenditure of non-federal funds on NCLB. This satisfies the redressability requirement.

**B.       Plaintiffs Have Stated a Claim That They Are Not Liable For the Additional Costs of Compliance With NCLB Requirements**

We conclude that Plaintiffs have stated a claim under NCLB. In support of this conclusion, we first set forth the Spending Clause landscape governing this matter, focusing on the requirement that legislation enacted under the Spending Clause provide clear notice to the States of their liabilities under that legislation. We then conclude that NCLB, by its terms, fails to provide clear notice of the States' obligation to incur additional costs to comply with the Act's requirements. We additionally explain that the legislative history does not suggest that this notice is clear. Finally, we note that even the Defendant in this matter previously expressed a view of the contested funding provision that coincides with the interpretation that Plaintiffs urge here.

1.       *The Clear-Notice Requirement Under the Spending Clause*

Congress enacted NCLB under the Spending Clause. U.S. Const. art. I, § 8, cl. 1; *see Spellings*, 453 F. Supp. 2d at 469. "Congress has broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, __ U.S. __, 126 S. Ct. 2455, 2459 (2006) (citing *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)). "[B]ut when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and *Bd. of Educ. v. Rowley*, 458 U.S. 176, 204 n.26 (1982)). Legislation enacted under "'the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). "By insisting that Congress speak with a clear voice," the Supreme Court enables States "to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17. Moreover, "in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Id.* at 17–18.

In *Pennhurst*, the Supreme Court applied these principles to conclude that States participating in the Developmentally Disabled Assistance and Bill of Rights Act of 1975 ("DDA"), 42 U.S.C. §§ 6000–6081, were not required to assume costs of providing certain treatment and services to mentally disabled citizens. 451 U.S. at 5. The DDA provided financial assistance to participating States to aid them in creating programs to care for and treat the mentally disabled. *Id.* at 11. The DDA also provided a variety of conditions for the receipt of federal funds, such as that the States submit a plan to evaluate the services provided under the DDA to the Secretary of the Department of Health and Human Services. *Id.* at 12. At the heart of the case was the DDA's "bill of rights" provision, which provided that mentally disabled citizens "have a right to appropriate treatment, services, and habilitation for such disabilities" to be provided "in the setting that is least restrictive of the person's personal liberty." *Id.* at 13 (quoting § 6010). The plaintiffs, certain disabled citizens of Pennsylvania (a participant in the DDA), sued their state-owned institution to enforce these "rights," that is, to compel Pennsylvania to pay for the costs of these services. *Id.*

The Supreme Court held, however, that the foregoing language in the DDA's "bill of rights" provision did not create enforceable obligations on the State. The Court explained that the provision's terms, "when viewed in the context of the more specific provisions of the Act, represent general statements of federal policy, not newly created legal duties." *Id.* at 22–23. The Court also noted that the Act's "plain language" supported this view. It stated that "[w]hen Congress intended to impose conditions on the grant of federal funds," as in other sections of the DDA, "it proved capable of doing so in clear terms," by, for example, using the term conditioned. *Id.* at 23. This "bill of rights" section, "in marked contrast, in no way suggest[ed] that the grant of federal funds [was] 'conditioned' on a State's funding the rights described therein." *Id.* The Court further noted that the Federal Government had no authority under the DDA to withhold funds from States for failing to comply with this "bill of rights" section. *Id.* Accordingly, that section could "hardly be considered a 'condition' of the grant of federal funds." *Id.* The Court also explained that the funds Congress provided to Pennsylvania under the DDA were "woefully inadequate to meet the enormous financial burden of providing 'appropriate' treatment in the 'least restrictive' setting." *Id.* at 24. This confirmed that "Congress must have had a limited purpose in enacting" this provision because Congress "usually makes a far more substantial contribution to defray costs" when it "impose[s] affirmative obligations on the States." *Id.* "It defies common sense," the Court concluded, "to suppose that Congress implicitly imposed this massive obligation on participating States."[3] *Id.*

The Court reiterated that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.* "That canon," the Court continued, "applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate." *Id.* "The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but *whether Congress spoke so clearly that we can fairly say that the State could make an informed choice.*" *Id.* at 25 (emphasis added). Thus, the Court concluded that "Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" the "bill of rights" provision in the DDA. *Id.*

The Court recently applied these principles again in *Arlington*, where a similar question arose under the Individual with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400–1482. The IDEA, enacted under the Spending Clause, "provides federal funds to assist state and local agencies in educating children with disabilities and conditions such funding upon a State's compliance with extensive goals and procedures." *Arlington*, 126 S. Ct. at 2458 (internal quotation marks and citation omitted). Central to the dispute in *Arlington* was that the IDEA provided that a court "'may award reasonable attorneys' fees as part of the costs'" to parents who prevail in an action brought under the Act. *Id.* at 2459 (quoting 20 U.S.C. § 1415(i)(3)(B)).

The plaintiffs in *Arlington* sued under the IDEA on behalf of their son to require the Arlington Board of Education to pay for their son's private-school tuition for specified school years. *Id.* at 2457. The plaintiffs prevailed in the district court, and the Second Circuit affirmed. *Id.* at 2458. As prevailing parents, the plaintiffs then sought fees under the aforementioned provision for the services of an educational consultant who assisted them throughout the IDEA proceedings. *Id.*

Noting that "resolution of the question presented in this case is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause," the Supreme Court ultimately held that the plaintiffs were not entitled to these expert fees. *Id.* The Court reaffirmed *Pennhurst*'s

---

[3]In this case, Plaintiffs do not dispute that Congress did clearly intend to place a condition on the grant of federal funds. However, as the dissent notes, "there is no mention of the cost of compliance anywhere in the text of the NCLB." Dissenting Op. at 21. Plaintiffs argue that this silence cannot be taken as a clear statement that States and local governments would be required to expend their own funds to cover any shortfall of federal funds.

principle requiring clear notice to States of their obligations under such legislation, and the Court further explained how that principle applies. *Id.* at 2459. The Court stated that it "must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Id.* The Court "must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees." *Id.* "In other words," the Court continued, "we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case." *Id.*

Applying these principles, the Court first considered the IDEA text. *Id.* ("In considering whether the IDEA provides clear notice, we begin with the text."). The Court noted that it has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citation omitted). The Court then explained that, although the IDEA fee provision "provides for an award of 'reasonable attorneys' fees,' this provision does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts." *Id.* Accordingly, the Court rejected the plaintiffs' argument that, because expert fees amounted to "costs" in IDEA proceedings and because the provision allowed for reasonable attorneys' fees "as part of the costs," the plaintiffs were entitled to expert fees. *Id* at 2459-60. The Court explained that the provision "certainly fails to provide the clear notice that is required under the Spending Clause." *Id.* at 2460.

The Court then explained that other provisions of the IDEA supported this view of the text. For example, the IDEA had detailed provisions to ensure that attorneys' fees were reasonable, but lacked comparable provisions regarding expert fees. *Id.* Additionally, the Court concluded that its holding was consistent with prior cases addressing the definitions of *costs* and *fees*. *Id.* at 2461–62.

The Court remained unswayed in this conclusion even in light of evidence that Congress intended precisely the opposite interpretation—that is, that States must compensate prevailing parents for expert fees. The plaintiffs explained that Congress approved a Conference Report stating that "[t]he conferees intend[ed] that the term 'attorneys' fees as part of the costs' *include reasonable expenses and fees of expert witnesses . . . .*" *Id.* at 2462 (quoting H.R. Conf. Rep. No. 99-687, at 5) (emphasis added). "No Senator or Representative voiced *any* opposition to this statement in the discussion preceding the vote on the Conference Report—the last vote on the bill before it was sent to the President." *Id.* at 2466 (Breyer, J., dissenting) (emphasis in original). The Court explained that, "[u]nder these circumstances, where everything other than the legislative history overwhelmingly suggests that expert fees may not be recovered, the legislative history is simply not enough." *Id.* at 2463. "In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but *what the States are clearly told* regarding the conditions that go along with the acceptance of those funds." *Id.* (emphasis added). This legislative history, therefore, was not "sufficient to provide the requisite fair notice" that States bore this liability under the IDEA. *But see id.* at 2466 (Breyer, J., dissenting) ("I can find no good reason for this Court to interpret the language of this statute as meaning the precise opposite of what Congress told us it intended.").

> 2.       *NCLB's Lack of Clear Notice Regarding State Funding Obligations*

> a.       *Text of the Act*

Turning to the present case, *Arlington* instructs that we must view NCLB from the perspective of a state official who is engaged in the process of deciding whether the State should accept NCLB funds and the obligations that accompany those funds. In other words, we must determine whether NCLB furnishes clear notice to the official that her State, if it chooses to participate, will have to pay for whatever additional costs of implementing the Act that are not

covered by the federal funding provided for under the Act. Or, as one might phrase the question, whether that state official would clearly understand that one of the State's obligations under the Act is the obligation to incur costs not paid for under the Act. Because § 7907(a) explicitly provides that "[n]othing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act," a state official would not clearly understand that obligation to exist. To the contrary, based on this text, a state official could plausibly contend that she understood exactly the opposite—that her State need not comply with NCLB requirements for which federal funding falls short.

That is not to say, however, that the Secretary's interpretation of the Act (discussed in more detail below) is frivolous. Indeed, perhaps the Secretary's view of the text is ultimately correct. But the only relevant question here is whether the Act provides *clear notice to the States* of their obligation. *See Arlington*, 126 S. Ct. 2463 ("In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds."). With this rule in mind, we turn to the Secretary's interpretations of the text and explain why they do not persuade us that the States' funding obligations are clear.

### b.          *The Secretary's Interpretations of the Text*

There are essentially two other interpretations of § 7907(a) advanced in this case, both of which would require the States to fully fund in compliance with NCLB regardless of federal funding. The first, which the district court adopted, is that this section merely prevents officers and employees of the federal government from imposing additional, unauthorized requirements on the participating States. The second is that this section simply emphasizes that State participation in NCLB is entirely voluntary, but that once a State chooses to participate, it must fully comply with NCLB requirements regardless of federal funding. As discussed below, neither of these interpretations is evident.

### (1)          *Stopping Rogue Federal Officers or Employees*

The view that § 7907(a) simply restricts federal officials from imposing *additional* requirements—that is, those not authorized by the Act—on participating States arises from the first part of § 7907(a), which discusses "an officer or employee of the Federal Government." This reading, as shown in italics below, interprets the Act to preclude any such officer or employee from mandating that a State incur costs not paid for under (that is, not authorized by) the Act:

> General prohibition. *Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to* mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or *mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act*.

20 U.S.C. § 7907(a) (emphasis added).

The district court accepted this interpretation when dismissing Plaintiffs' suit for failure to state a claim. *Pontiac*, 2005 U.S. Dist. LEXIS 29253, at *12. As the district court explained, "Defendant argues convincingly that this sentence simply means no federal 'officer or employee' can require states or school districts to 'spend any funds or incur any costs not paid for under this Act.'" *Id.* at *11. The court further explained that, "[b]y including the words 'an officer or employee of,' Congress clearly meant to prohibit federal officers and employees from imposing

additional, unfunded requirements, beyond those provided for in the statute." *Id.* at \*12. In sum, the court concluded that § 7907 merely prevents rogue officers from imposing requirements not authorized by the Act. There are two problems with this interpretation.

First, even if the Government presented a convincing argument that Congress intended this meaning, the requirements of the Spending Clause still would not have been met as this reading certainly falls short of being so evident that a State would clearly understand it to be the interpretation Congress intended.

Second, it is not evident that the *officer or employee* language modifies the final clause discussing States incurring costs under the Act. In other words, the *officer or employee* language is reasonably read to modify only the middle clause regarding state and local control over curriculum, as follows: "Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources . . . ." This reading leaves the final clause to be modified simply by the opening clause, as follows: "Nothing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act." In this way, the Act simply prevents federal officers from controlling school curriculum and allocation of local funds, but says nothing about these officers mandating States to spend funds or incur costs for unauthorized obligations.

Third, even assuming that the *officer or employee* language modifies the final clause, more fundamental problems emerge. For one, the Secretary's view that this section is intended to prevent federal officers from imposing unauthorized requirements on States would have us substitute words that are not in the statutory text ("Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not [*authorized under this Act*]") for words that are in the text (". . . or incur any costs *not paid for under this Act*"). Stating that a federal officer cannot require a State to incur any costs "not paid for" under the Act is, to say the least, an unusual way of prohibiting an officer from forcing a State to incur costs for something that is not *authorized* under the Act. Were Congress truly concerned about this sort of ultra vires conduct by federal officers and employees, it could have said so expressly. Moreover, nothing in the legislative history (discussed in more detail below) suggests that this was Congress's concern. Yet even if this were what Congress meant, we would be left with the following tautology: This Act does not authorize federal officers or employees to require that States incur costs for anything that the Act does not authorize. We doubt that Congress intended this empty meaning.

For these reasons, we find this rogue-officer interpretation unconvincing. In any event, the interpretation is not so evident that a State would clearly understand it to be the interpretation Congress intended, and thus the interpretation cannot save the Act from violating the Spending Clause.

(2)      *Emphasizing that Participating in the*
          *Act is Voluntary*

The Secretary also contends that the reference in the final clause of § 7907(a) to a State's costs under the Act simply emphasizes that a State's decision to accept federal funding under NCLB in exchange for complying with requirements under the Act is entirely voluntary. The Secretary notes that this section provides limits on what the Act (or, if one accepts the reading discussed above, on what federal officers and employees) can "mandate" the States to do:

> General prohibition. Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to *mandate*, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or *mandate* a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act.

20 U.S.C. § 7907(a) (emphasis added). The Secretary explains, "as Congress fully understood, a statute [such as NCLB] that imposes conditions on a receipt of federal funds is not a 'mandate.'" (Secretary's Br. 22.) The Secretary here contends that nothing in the Act is a mandate, but that this section simply "ensured that States would not be subject to mandates that formed no part of the conditions set out in the statute." (*Id.*) The Secretary additionally notes that the Unfunded Mandates Act ("UMA"), 2 U.S.C. § 658(5)(A)(i)(I), defines "federal intergovernmental mandate" to exclude voluntary participation with federal programs. (*Id.*)

But Plaintiffs' contention is not that NCLB *as a whole* is an unfunded mandate forced upon the States; they appear willing to concede that it is a voluntary program, and their argument focuses on § 7907(a), not the UMA.[4] Plaintiffs argue that, *now that they are participating* in NCLB, the Secretary is imposing (that is, "mandating") liabilities that they simply did not bargain for—and that were expressly excused by § 7907(a)—when they signed on to NCLB. This view is reasonable, and there are at least three additional reasons why the Act does not provide clear notice that § 7907(a) speaks merely to the voluntariness of the program as opposed to relieving the States of their obligation to comply with unfunded requirements.

First, based on the plain language of § 7907(a), it is not apparent that this section speaks to the question of voluntary participation in NCLB as opposed to States' obligations—such as complying with requirements where federal funding falls short—*after* the States have agreed to participate (whether voluntarily or by coercion or otherwise). It would be one thing if the Act stated that nothing in it shall be construed to mandate a State to "comply with the Act" or that nothing in the Act shall be construed to mandate a State to "incur any costs under this Act"—language like that would indicate that States can simply choose not to comply with the Act altogether. Instead, however, the text provides that nothing in the Act shall be construed to mandate a State to "incur any costs *not paid for under this Act*"—language that a State could reasonably interpret to relate to its obligations after it has agreed to comply with the Act. Indeed, Vermont is one such State. It passed a law, based on this text, providing that neither the State nor its subdivisions will be required to "incur any costs not paid for under the Act *in order to comply with the provisions of the Act*." 16 V.S.A. § 165 (emphasis added). In short, it is not apparent that § 7907(a) relates merely to the States' freedom to choose whether to opt into the Act in the first place.

Second, the use of the exact language of § 7907(a) in the Perkins Vocational Education Act, 20 U.S.C. §§ 2301–2471 (1988), shows that the language is not about voluntary compliance; it is about a State's funding obligations under NCLB. Under the Perkins Act, federal grants are issued to "assist the States to expand, improve, modernize, and develop quality vocational education programs in order to meet the needs of the Nation's existing and future work force for marketable skills and to improve productivity and promote economic growth." *Pennsylvania v. Riley*, 84 F.3d

---

[4] A question has been raised, however, whether a State can, as a practical financial matter, refuse federal funding under NCLB. (*See, e.g.*, Amicus Curiae Br. of the Governor of the Commonwealth of Pennsylvania at 20 (noting that "states have come to depend upon [federal] funds to provide extra assistance to students who are economically and academically disadvantaged" and that "states are coerced to accept additional and financially burdensome requirements, so that they may continue to provide services and programs that they have offered to their neediest students for years").) *See also New York v. United States*, 505 U.S. 144, 175 (1992) (noting in another context that "Congress has crossed the line distinguishing encouragement from coercion").

125, 127 (7th Cir. 1996) (citing 20 U.S.C. § 2301(1)).  Section 2306a of the Perkins Act, entitled "Prohibitions," replicates NCLB's § 7907(a), but adds a final clause:

> (a) Local control.  Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act, *except as required under sections 112(b), 311(b), and 323*.

20 U.S.C. § 2306a(a) (emphasis added).  The sections of the Perkins Act referred to in this final clause require agencies in States participating in the Act to spend non-federal funds. *See, e.g.*, 20 U.S.C. § 2413(a) (Perkins Act § 323) ("Except as provided in subsection (b), for each fiscal year for which an eligible agency *receives assistance under this Act*, the eligible agency shall provide, *from non-Federal sources for the costs the eligible agency incurs for the administration of programs under this Act*, an amount that is not less than the amount provided by the eligible agency from non-Federal sources for such costs for the preceding fiscal year.") (emphasis added).  Thus, the preceding language in § 2306a(a), which mirrors NCLB § 7907(a), explains that participating States need not spend their own funds to comply with the Perkins Act; the final clause—absent in NCLB—provides the explicit exceptions describing *when participating States do have to expend their own funds*.  The common language in these Acts therefore does not simply reiterate that States may or may not participate in the federal program.

The dissent is correct in noting that there are differences between the Perkins Act and NCLB.  However, the differences in the overall structure of the statutes do not negate the informative role that the identical 62-word provision found in both of the statutes can provide.  In the Perkins Act, the 62-word provision is followed by exceptions to the provision.  In NCLB, the 62-word provision is followed by no exceptions.  The difference between the Perkins Act and NCLB in this regard shows that Congress is capable of explicitly stating when States must provide funding under these Acts.  *Cf. Pennhurst*, 451 U.S. at 17–18 ("[I]n those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly.").  The dissent's conclusion that these identical 62-word statutory phrases in the Perkins Act and NCLB have fundamentally different meanings because the Acts have "different relationship[s] between requirements and funding," Dissenting Op. at 24, would be anything but clear to a reasonable state official.

Third, comparison of the use of the word "mandate" in § 7907(a) with the provisions of the UMA shed little light here, as (1) NCLB makes no reference to the UMA's definition of "mandate," which excludes voluntary participation in federal programs, and (2) "the label 'mandate' is often applied to obligations that states assume voluntarily in order to qualify for federal funds." Patricia T. Northrop, Note, *The Constitutional Insignificance of Funding for Federal Mandates*, 46 Duke L.J. 903, 903 n.2 (1997).  Indeed, another section of the UMA itself defines "mandate" to *include* a duty arising from voluntary participation in federal programs.  2 U.S.C. § 1555 (defining the phrase for purposes of a commission that would review federal mandates); *see also* Makram B. Jaber, Comment, *Unfunded Federal Mandates: An Issue of Federalism or a "Brilliant Sound Bite"?*, 45 Emory L.J. 281, 288 (1996) ("Read liberally, this definition [in Section 1555] considers as an 'unfunded federal mandate' any federal statute or regulation that results in any duties imposed on state or local governments, even if the state takes on such duties voluntarily, so long as the resulting costs to these governments are not directly and fully funded by the federal government.").

For all of these reasons, we conclude that if NCLB requires States to comply with all NCLB requirements even where States must incur additional costs not paid for through federal funds, there

is no clear notice of that obligation.  But we pause to emphasize one final point.  There is no real dispute that States and school districts participating in NCLB must fulfill the Act's various educational and accountability requirements, such as submitting plans to the Secretary, effectively tracking student achievement, and so forth.  In that respect, the States are on clear notice of these obligations.  And, as the Secretary points out, that stands in contrast to *Pennhurst*, where the hortatory "bill of rights" in the DDA did not create legal obligations on the State, *see* Dissenting Op. at 17, and to *Arlington*, where the IDEA's arguable grant of expert fees to prevailing parties was not explicit in the text and therefore created no such obligation on the States.  But Plaintiffs here do not contend that their obligation to comply with NCLB's various educational requirements is in any way unclear. *See* Dissenting Op. at 27.  They contend that their obligation to spend additional funds or incur additional costs for that compliance is unclear.  As *Arlington* instructs, "we must ask whether the [NCLB] furnishes clear notice regarding *the liability at issue in this case*."  126 S. Ct. at 2459 (emphasis added).  Faced with § 7907(a), which provides in a catchall phrase that "*[n]othing in this Act shall be construed*" to require States and localities to "spend any funds or incur any costs not paid for under the Act," we conclude that Plaintiffs' liability in this respect is anything but clear.  Accordingly, the Secretary's interpretations of § 7907(a) violate the Spending Clause.

c.        *Legislative History*

Our conclusion that NCLB fails to provide requisite notice to States of their funding obligations under the Act rests on the plain meaning of the statutory text, as discussed above.[5]  We note, moreover, to the extent that legislative history informs this question, that legislative history supports our conclusion.  In this way, the Spending Clause violation here is even more apparent than it was in *Arlington*, where the Court found a lack of clear notice of the States' liabilities even where Congress explicitly stated that it intended the States to assume those liabilities. *See Arlington*, 126 S. Ct. at 2465.

As mentioned, NCLB was first passed as the Elementary and Secondary Education Act of 1965.  The language of § 7907(a) was included in three education statutes that Congress enacted in 1994: (1) the Goals 2000 Educate America Act, Pub. L. 103-227 (enacted in March 1994 to provide funding for States to set some of the academic standards that NCLB ultimately mandated); (2) the School to Work Opportunities Act, Pub L. 103-229 (enacted in May 1994 to provide funding for certain work-related education programs); and (3) the October 1994 reauthorization of the ESEA, titled the Improving America Schools Act (IASA), Pub. L. 103-382.  The text of § 7907(a) was carried over to NCLB without significant change from these 1994 statutes.  The 1993–94 legislative debates regarding the language are therefore informative. *See W. Pac. R.R. Corp. v. W. Pac. R.R.*, 345 U.S. 247, 251 (1953) (considering legislative debate regarding earlier proposal to construe later proposal regarding the same topic).

Representatives Goodling and Condit introduced the first part of the language forming the basis of § 7907(a) on the floor of the House during the debate over Goals 2000.  Although Goals 2000 lacked NCLB's mandatory testing and penalty structure, it required States to submit plans to the federal government showing how they would achieve high academic standards for their students, identify low-performing schools, and set goals for teacher certification.  The introduced text, equivalent to the first part of § 7907(a), provided as follows:

---

[5]The dissent apparently disagrees. *See* Dissenting Op. at 23. ("[A]ny reasonable state official, reading the NCLB with a clear eye, would understand that there was no guarantee that federal funds would match all of the costs controlled and incurred by states and local school districts.")  The dissent argues that fluctuating appropriations and unpredictable costs of compliance lend support to this conclusion. *See* Dissenting Op. at 22.  However, this argument does not provide clarity regarding who bears the cost of a reduced level of federal funding or higher-than-expected costs of compliance.

> Nothing in this section shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State and local resources.

139 Cong. Rec. H7769 (daily ed. Oct. 13, 1993). Rep. Goodling explained that the language prohibiting federal government control over the "allocation of State and local resources" was intended to "put to rest the concern that we are going to dictate from the Federal level that somewhere, some way, the local and State Governments will find money for our dictates." 139 Cong. Rec. H7741 (daily ed. Oct 13, 1993). As Rep. Condit explained, "I believe that it is wrong for us on the Federal level to pass legislation but shift the costs of implementation and compliance to our State and local governments." 139 Cong. Rec. H7769 (daily ed. Oct 13, 1993).

The final language of this provision in Goals 2000—which would also ultimately appear in § 7907(a)—came from the Senate, which incorporated the Goodling-Condit language above and added the second phrase: " . . . or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act." 140 Cong. Rec. S626 (daily ed. Feb. 2, 1994) (amendment no. 1358, as modified). As explained by its sponsor Sen. Gregg, the amendment's purpose was "to assure that this bill will not become an unfunded mandate . . . to make it clear that if the Federal Government tells the State to do something or tells the local community to do something, the Federal Government will have to pay for the costs of that mandate." *Id.* The Senate version of the provision was then accepted and became the enacted language in the Goals 2000 Act. H. Conf. Rpt. 107-446 (Mar. 21, 1994). This same provision was added to the School to Work Opportunities Act, which was also pending at that time. H. Conf. Rpt. 103-480 (Apr. 19, 1994).

The provision was then included in the IASA, the direct predecessor to NCLB. Before the language was added to the IASA, early debates in the House included criticisms that the bill "provides all the mandates, but no money to pay for them. The Federal Government makes a multitude of new demands, but it is accountable for none." 140 Cong. Rec. H807 (daily ed. Feb. 24, 1994) (Rep. Barrett). Sen. Durenberger noted instead that the "amendment regarding unfunded mandates, which is not part of this legislation, clearly states that if any requirement in this bill results in an unfunded mandate, affected States and communities do not have to comply." 140 Cong. Rec. S14205 (daily ed. Oct. 5, 1994).

Plaintiffs contend that this legislative history confirms that under § 7907(a) they need not comply with NCLB requirements that are not adequately funded. In light of the statements recounted above, this is an entirely supportable position. The Secretary argues, however, that these same statements support her position that § 7907(a) merely emphasizes that a State's decision to participate in NCLB is entirely voluntary. In other words, she contends that when Representatives and Senators stated that these various statutes would not become "unfunded mandates," they meant that, because States remained free not to accept federal funding under these statutes, nothing in them was mandated. This is also a colorable view of the debates (though perhaps with some exceptions, *see, e.g.*, 139 Cong. Rec. H7769–70 (Rep. Condit) (stating that it was not Congress's intent to require States to choose among "tak[ing] the requirement seriously and end[ing] up with a multimillion-dollar unfunded Federal mandate . . . or refus[ing] to participate in the program.")).[6]

Thus, this legislative history, to the extent it informs a reading of NCLB, is at best unclear regarding the fundamental dispute regarding § 7907(a). Indeed, to the extent it supports either party,

---

[6] As noted earlier, little, if any, of the debates involved a concern about federal officials imposing unauthorized requirements on the States—the basis of the district court's rogue-officer interpretation that the Secretary also advances.

it bolsters Plaintiffs' interpretation.[7]  Accordingly, it adds no more clarity of notice to the States regarding their obligations to comply with NCLB funding requirements than the text itself.

> d.          *The Former Secretary Expressed Plaintiffs' Interpretation of the Text*

We have concluded that a state official would not be on clear notice that her State, once it opts into NCLB, would be required to comply with NCLB requirements that are not paid for under the Act.  We note here that even the Defendant's former views on this topic suggest that this conclusion is proper.  As Plaintiffs explain, former Secretary of Education Rod Paige (since succeeded by current Secretary Margaret Spellings) stated that the Act "contains language that says *things that are not funded are not required.*"  (JA 20 (quoting Paige statement of Sept. 4, 2003) (emphasis added).)  Reiterating this point in a later speech, Paige reassured that "if it's not funded, it's not required.  There is language in the bill that *prohibits requiring anything that is not paid for.*" (JA 21 (quoting Paige statement of Dec. 2, 2003) (emphasis added).)

The Secretary does not dispute that her predecessor made these statements; she explained at oral argument that they were "stray comments."  Stray or not, the comments leave us to wonder how a state official would be on clear notice that her State would have to comply with obligations under the Act that are not funded when the Secretary of Education cited to appropriate text in the Act itself to assure States that there is no such requirement.  It comes as no surprise that many state officials do not have this understanding in light of § 7907(a).  *See, e.g.*, Wisc. Atty. Gen. Ltr. Op. at 4 (May 12, 2004) ("The language in 20 U.S.C. § 7907(a) . . . seems to bear only one reasonable interpretation: federal agencies and officials lack authority to require any State, or State subdivision, to take any action under the ESEA [which NCLB amended] that is not fully funded by federal monies.") (available at http://www.nsba.org/site/docs/33800/33758.pdf) (last visited Dec. 28, 2007); Nat'l Conf. of State Legislators Mem. (July 7, 2003) (noting, in a memorandum to State legislative presiding officers, chairs of education committees, and legislative education staff, that "[u]nder the basic rules of statutory construction, *the plain meaning of the statutory language [of § 7907(a)] is fairly clear—states, or local subdivisions, do not have to spend funds on the costs of the NCLB that are not paid for by the Act itself.*") (available at www.ncsl.org/statefed/nclblegal.htm) (last visited Dec. 28, 2007); 46 Conn. S. Proc. pt. 9, 2003 Sess. 2626, 2632 (May 21, 2003) (statements of Sen. Sullivan) (noting that Connecticut can "only pray that that one magic phrase [in] Leave No Child Behind [sic] that says if the feds don't fund it, we don't have to do it, turns out to be real," because "if the money ain't there folks, we can't do it."); 16 V.S.A. § 165 (2003) ("[C]onsistent with [§ 7907] of the No Child Left Behind Act, neither the state nor any subdivision thereof shall be required to spend any funds or incur any costs not paid for under the Act in order to comply with the provisions of the Act.").  To be sure, state officials may have their own interests in reading § 7907(a) to excuse their States' obligations to comply with unfunded requirements of NCLB; our point is merely that NCLB does not provide clear notice that their interpretation (and, apparently, the former Secretary's) is somehow misplaced.

---

[7] The dissent states that because "there was no discussion of changing the historic funding scheme of our nation's educational system, from largely state funds to federal funds," the legislative history does not support the Plaintiffs' argument.  Dissenting Op. at 28.  However, the Plaintiffs' interpretation of the Act does not require, or even suggest, that such a change was intended in the Act.  Rather, the Plaintiffs' reading of the Act and their arguments before this Court request recognition that when acts of the Legislature are implemented pursuant to the spending power, the Legislature cannot impose a condition on federal funds that requires States to spend their own funds absent a clear statement that such a condition has been placed on the funds.

The dissent's further accusation that this opinion's holding is "contrary to the way our nation's education has been operated and funded for centuries" reads the majority opinion much too broadly.  *See* Dissenting Op. at 19.  We hold only that the Spending Clause requires a more clear statement from Congress before States and local educational agencies can be required to expend their own funds in order to comply with federal guidelines.

## III. CONCLUSION

The No Child Left Behind Act rests on the most laudable of goals: to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education." 20 U.S.C. § 6301. Nobody challenges that aim. But a state official deciding to participate in NCLB could reasonably read § 7907(a) to mean that her State need not comply with requirements that are "not paid for under the Act" through federal funds. Thus, Congress has not "spoke[n] so clearly that we can fairly say that the State[s] could make an informed choice" to participate in the Act with the knowledge that they would have to comply with the Act's requirements regardless of federal funding. *See Pennhurst*, 451 U.S. at 25. Of course, if that ultimately is what Congress intended, the ball is properly left in its court to make that clear. *See Arlington*, 126 S. Ct. at 2465 (Ginsburg, J., concurring) ("The ball, I conclude, is properly left in Congress' court to provide, if it so elects, for consultant fees and testing expenses beyond those IDEA and its implementing regulations already authorize, along with any specifications, conditions, or limitations geared to those fees and expenses Congress may deem appropriate.")(footnote omitted). Accordingly, we **REVERSE** the district court's judgment dismissing Plaintiffs' complaint and **REMAND** for further proceedings consistent with this opinion.

————————————

**DISSENT**

————————————

McKEAGUE, Circuit Judge, dissenting. Imagine the following: there is a service with which State and local governments have historically provided its citizens. The governments finance the service through taxes. Local provision, local financing, local control. But now, imagine that the federal government comes along and offers a deal associated with that service. The deal comes with both a carrot (more money) and a stick (more duties). A reading of the offer sheet confirms what could be expected: the duties are mandatory if they choose to participate, but the money, well, like all money from the federal government, is subject to change from year-to-year. But, the reading also confirms that the offer can be accepted in one period and dropped the next, so the risks are not open-ended. The State and local officials are thus faced with a choice: accept the money and assume the duties, or forgo both and go it alone with less money but fewer duties.

There is, of course, really no need to imagine such a world—what I have described is not the Emerald City in the Land of Oz but rather this country's primary and secondary education system. But rather than wearing green-tinted glasses, I submit that the inhabitants of this system—State and local school officials—had a crystal clear vision of what Congress was offering them by way of the No Child Left Behind Act of 2001 (the "NCLB"). Many of them could not bring themselves to pass up the federal funds, but simply hoped that someone or something would save them at the end of the road. Today the majority does exactly that.

While the federal government historically has always contributed a relatively small amount to the total funding of local education, increasingly it has become concerned about the decline in the quality of children's education, particularly with respect to the nation's most at-risk children. In an attempt to achieve more accountability in local education, Congress passed the NCLB, which revised the earlier Elementary and Secondary Education Act of 1965 ("ESEA"), Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. §§ 6301-7941). Although participation in the NCLB is voluntary, Congress imposed significant educational reforms for those states that elect to participate and receive federal funds. Today the majority holds, in an opinion contrary to the way our nation's education has been operated and funded for centuries, that Congress could have intended that the federal government now fund the entire cost of various educational reforms for our nation's children. Because there is no support in the text or context of the NCLB for the proposition that Congress intended such a monumental and unprecedented change in our nation's education funding, I respectfully dissent.

**I**

Regardless of whether federal funds defray the entire cost of compliance, participating States and school districts must comply with the NCLB's educational requirements. Contrary to the majority's conclusion, § 7907(a) does not render the NCLB ambiguous; thus, Congress did not exceed its authority under the Spending Clause. By creating ambiguity where none exists, the majority largely avoids Plaintiffs' principal argument on appeal, although it does allude in passing to its inherent weakness. *See* Maj. op. at 11 ("Indeed, perhaps the Secretary's view of the text [of § 7907(a)] is ultimately correct."). As I find no ambiguity, I must first address Plaintiffs' principal argument.

Plaintiffs contend that a plain reading of 20 U.S.C. § 7907(a) leads to the conclusion that notwithstanding States' acceptance of federal funds intended to defray a portion of the cost of local education, States and local school districts need not comply with the educational requirements set

forth in the NCLB if they deem federal funding to be insufficient to cover the entire cost of compliance. Section 7907(a) states in relevant part: "Nothing in this Chapter shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Chapter." Plaintiffs argue that § 7907(a) means that the "NCLB cannot be implemented in a manner that requires states and school districts 'to spend any funds or incur any costs not paid for under th[e NCLB].'" Appellants' Br. at 28-29 (quoting 20 U.S.C. § 7907(a)) (alteration in original). As explained below, the text, operation, and structure of the NCLB undermine Plaintiffs' reading. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 666-67 (1985) ("[T]he background of the actual operation of Title I" informs a proper understanding of "the fundamental nature of the obligations assumed under Title I."). Instead, § 7907(a) is properly read to mean that federal officers who are charged with implementing and administering the NCLB cannot transform the statutory scheme from a voluntary program to a mandatory one. Plaintiffs' interpretation has the absurd effect of eviscerating with a single provision the entire comprehensive scheme of accountability requirements and financial disbursements set forth in hundreds of pages of statutory text. Without a stronger showing that Congress actually intended that result, I decline to adopt such an untenable interpretation.

## A.      NCLB Educational Requirements

The NCLB expressly outlines participating States' and school districts' obligations to meet various educational requirements. If a State accepts money under a particular part of the NCLB, it must comply with that part's requirements. 20 U.S.C. § 6311(a)(1); *see also id.* §§ 6363(a)(1), 6396(a)(1), 6842(a)(1). Conversely, if a State does not seek any funding under the NCLB, it need not comply with any of the NCLB's requirements.

School districts within a participating State face a more complicated set of obligations. Most of the NCLB's funds are allocated to school districts based on the number of qualifying students in the school (e.g., low-income students, migrant students, etc.). School districts without at-risk students will not receive any funding under particular parts of the NCLB and therefore will not be required to comply with some of the NCLB's requirements.

Yet, districts without at-risk students are not completely off the regulatory hook. Some requirements under Title I, Part A apply across an entire participating State, rather than just to those "local educational agenc[ies]" (i.e., school districts) that receive federal funds. For example, a participating State must create statewide academic standards and *all* school districts in the state must test their public-school students under those standards. *Id.* § 6311(b)(1)(B), (3)(A). The broad reach of § 6311 is made clear by the limited exception for school districts that do not receive federal funds: they need not publish the results of student testing or take certain steps if a school fails to make AYP. *Id.* §§ 6311(b)(2)(A)(ii), 6316. Pointedly, Congress *did not* tell non-funded school districts that they need not perform any testing in the first instance.

This example highlights the central defect in Plaintiffs' argument. Congress intended, as expressed in the text of the NCLB, that a participating State raise standards of student education across the entire state, regardless of whether one well-off pocket of the state does not receive any federal funds. In those districts that do receive federal funds, Congress simply requires even more. When Congress expressly applies certain requirements to all school districts irrespective of funding, that is a clear indication that it did not intend to tie the cost of complying with the NCLB's requirements to the amount of federal funding, which is inherently subject to change based on the spending priorities of each particular Congress and its competing demands for increasingly scarce federal dollars.

**B.      NCLB Funding Scheme**

Plaintiffs argue that the NCLB's educational requirements are enforceable only when the federal government defrays the entire cost of compliance. The funding structure of the NCLB dictates otherwise. Most telling is that there is no mention of the cost of compliance anywhere in the text of the NCLB, let alone any promise of relief if federal funding is insufficient to defray the entire cost of compliance. The NCLB's silence as to the cost of compliance or to any explicit relief therefrom if federal dollars fall short is particularly conspicuous here insofar as Congress, in structuring the NCLB, was well aware that our nation's education system is historically funded largely by State, *not* federal dollars. *Cf. Bennett v. New Jersey*, 470 U.S. 632, 635 (1985) (explaining that Title I was enacted by Congress with "[r]espect[] [for] the deeply rooted tradition of state and local control over education").

The NCLB's funds are distributed to schools and school districts based on the types of students in those schools and districts, not on costs. Under Title I, Part A, for each student from a low-income family or in institutional care, a school district is "eligible to receive . . . 40 percent of the average per-pupil expenditure in the State." 20 U.S.C. § 6333(a)(1)(B). Schools with more low-income students will receive more Title I, Part A funding than schools with fewer low-income students, and schools with no low-income students will receive no funds under the main grant in Title I, Part A. *See id.* § 6333(c)(2).

In most cases, schools that receive federal funding must spend the funds only on the specific students who count toward the amount of funding the school receives (low-income, migrant, etc.), not the entire student-body in general. For example, only where at least 40% of a school's students are low-income can the school use federal funds "to upgrade the entire educational program of a school." *Id.* § 6314(a)(1). For schools with less than 40% low-income students, the federal funds must be spent only on those low-income students. *See id.* Nevertheless, the latter schools must still meet all of the NCLB's requirements, regardless of federal spending on each particular student.

Other features of the NCLB's scheme undercut Plaintiffs' position. Congress capped the aggregate funds authorized under the NCLB without any provision for the actual costs of compliance. *Id.* § 6302(a). The NCLB also expressly provides for the possibility that funds available in a given year might be insufficient to pay all school districts the amounts they are *eligible* to receive: "If the sums available . . . are insufficient to pay the full amounts that all [school districts] are eligible to receive . . . , the Secretary shall ratably reduce" each school district's funding. *Id.* § 6332(b)(1). At no time have the amounts school districts are *eligible* to receive come even close to equaling the cost of compliance. Similar provisions appear in the programs for high-quality teachers and migrant children. *See, e.g.*, *id.* § 6393(c)(1)(A). Yet, there is no provision that excuses a school district's compliance with the NCLB's requirements in the face of a shortfall in the amounts school districts are eligible to receive, let alone the total cost of compliance.

This overview of the NCLB's funding structure highlights another important point. It simply defies commonsense to suggest that Congress intended to relieve States and school districts from compliance with the NCLB's requirements when the cost of compliance—which Congress *does not control*—exceeds appropriations, but not when the amounts appropriated—over which Congress *has total control*—fall below the amounts school districts are eligible to receive.

Plaintiffs argue that the fact that Congress has elected not to appropriate all the funding it is authorized to appropriate under Title I, Part A supports their position that the NCLB is underfunded. This actually shows just the opposite. Neither Title I, Part A nor any other part of the NCLB authorizes *any* appropriations beyond 2006-2007. *See, e.g.*, 20 U.S.C. §§ 6302(a), 6553, 6603(a), 6663, 6801(a), 7103. Continued NCLB funding will require reauthorization of

appropriations by Congress each year after 2006-2007. Yet, at the same time that it authorized funds only through 2006-2007, Congress applied the NCLB's educational requirements through 2013-2014. *See id.* § 6311(b)(2)(F); 34 C.F.R. § 200.15. Again, this demonstrates a fundamental and important disconnect between appropriations and requirements.

More importantly, Plaintiffs ignore the undisputable fact that even if Congress had "fully funded" the NCLB each year (i.e., annually appropriated the entire amount authorized), the funds would still have fallen far short of the total purported costs of compliance. This can be seen by comparing the disparity between actual appropriations and purported compliance costs versus the disparity between authorizations and actual appropriations. According to Plaintiffs' complaint, federal funding in Ohio covers less than 16% of costs for test development and administration. In Illinois, federal funding under Title I, Part A covers less than 33% of costs to achieve current AYP rates. In Vermont, Title I, Part A funding covers only 19% of current costs to achieve AYP. In the Jordan, Utah and Reading, Pennsylvania school districts, respectively, federal funding covers only 27% and 31% of the cost of AYP attainment. By contrast, actual appropriations have been somewhat greater than 66% of the authorized amount for the periods 2001-2002 through 2004-2005; for 2005-2006, slightly less.[1] Thus, even though Congress has routinely appropriated more than half the amounts authorized each year, the funds have, according to Plaintiffs, only covered about a third of the costs of compliance. In other words, the maximum amount of money from Congress would still have left the districts short. Congress's annual decisions not to appropriate up to the level authorized just confirms that it never intended to cover the entire costs of compliance in the first place.

Plaintiffs' interpretation of the NCLB not only disregards its overall statutory scheme, but it also defies reason and history. The overwhelming burden of funding education in this country is and always has been borne by State and local governments. Even with the NCLB, the federal government provides only 7% of the total funding for local education. 147 Cong. Rec. S13365, 13373 (2001) (statement of Sen. Feinstein). The notion that Congress intended to pay in full for a testing and reporting regime of indeterminate cost, designed and implemented by States and school districts, not federal agencies, is not only nonsensical and fiscally irresponsible, but also contravenes the traditional recognition of State and local governments' primary responsibility for public education. In short, there is nothing in the NCLB that suggests Congress intended to federalize some or all of State and local education.

## II

### A.    Text and Context of § 7907(a)

Alternatively, Plaintiffs argue that, even if § 7907(a) does not have the meaning they suggest, it creates an ambiguous condition on the receipt of federal funds, in violation of the so-called clear-statement rule.[2] Under that rule, "if Congress intends to impose a condition on the grant of federal

---

[1] Congress's actual appropriations and the appropriations authorized in Title I, Part A are, respectively: $10.35 billion and $13.5 billion for 2001-2002; $11.69 billion and $16 billion for 2002-2003; $12.34 billion and $18.5 billion for 2003-2004; $12.74 billion and $20.5 billion for 2004-2005; and $13.34 billion and $22.75 billion for 2005-2006. 20 U.S.C. § 6302(a); Complaint at 18.

[2] The clear-statement rule is one of several general restrictions on congressional authority under the Spending Clause. In addition to clearly articulating the condition on federal funds, the congressional action must be in pursuit of the general welfare; the conditions must be related to the federal interest being pursued; the financial incentives must not amount to coercion; and the conditions must comport with other constitutional provisions. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987); *Cutter v. Wilkinson*, 423 F.3d 579, 584-85 (6th Cir. 2005). Plaintiffs do not argue that the NCLB fails to satisfy these other restrictions.

moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The majority agrees, concluding that "a state official who is engaged in the process of deciding whether the State should accept NCLB funds and the obligations that go with those funds" would not understand that if the State "chooses to participate, [it] will have to pay for whatever additional costs of implementing the Act are not covered by the federal funding provided under the Act." Maj. op. at 11. To the contrary—any reasonable State official, reading the NCLB with a clear eye, would understand that there was no guarantee that federal funds would match all of the costs controlled and incurred by States and local school districts. *See Bennett*, 470 U.S. at 666 ("The requisite clarity in this case is provided by Title I; States that chose to participate in the program agreed to abide by the requirements of Title I as a condition for receiving funds.").

My statutory analysis consists of two elements: text and context. Beginning with the text of § 7907(a), I, like the majority, focus on the term "mandate," but, unlike the majority, I find that its meaning is unambiguous. As the Supreme Court has explained, "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary." *Lorillard v. Pons*, 434 U.S. 575, 583 (1978) (quoting *Standard Oil v. United States*, 221 U.S. 1, 59 (1911)) (alteration in original) (internal quotations omitted).

In 1995, Congress enacted the Unfunded Mandates Reform Act of 1995 ("UMA"), which provides the following definition:

> (5) Federal intergovernmental mandate. The term "Federal intergovernmental mandate" means –
>       (A) any provision in legislation, statute, or regulation that –
>               (I) would impose an enforceable duty upon State, local, or tribal governments, *except* –
>                       (I) a *condition of Federal assistance*; or
>                       (II) a duty arising from participation in a *voluntary* Federal program . . . .

2 U.S.C. § 658(5)(A) (emphasis added). Applying the UMA definition of mandate from § 658(5)(A), the § 7907(a) provision at issue means that a State is free to decide whether or not to participate in the NCLB, with its funding as well as its educational requirements; and, a State can forgo participation in the NCLB if it decides that such participation is not beneficial to its educational system. However, if a State chooses to participate, it must take all of the "bad"—the federal requirements—with the "good"—the federal money. This interpretation is consistent with the NCLB's educational requirements, funding provisions, and overall statutory scheme and avoids sweeping aside the main provisions of the scheme.

The majority points out that the UMA also provides a second definition of mandate, according to which "the term 'Federal mandate' means any provision in statute or regulation or any Federal court ruling that imposes an enforceable duty upon State, local, or tribal governments including a condition of Federal assistance or a duty arising from participation in a voluntary Federal program." 2 U.S.C. § 1555; Maj. op. at 14. However, this broader definition of mandate applies only to the collection of information, and not to the measures actually designed to limit mandates by Congress and federal agencies. Specifically, § 1555 applies only to provisions of the UMA which require that "the Advisory Commission on Intergovernmental Relations . . . shall complete a study to examine the measurement and definition issues involved in calculating the total costs and benefits to State, local, and tribal governments of compliance with Federal law." 2 U.S.C. § 1551(a). The primary definition found at § 658(5)(A) applies instead to all provisions designed "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on

State, local, and tribal governments without adequate Federal funding, in a manner that may displace other essential State, local, and tribal governmental priorities." *Id*. § 1501(2). The text of § 7907(a), and Plaintiffs' arguments based on § 7907(a), are consistent with the purpose to which the definition in § 658(5)(A) applies: namely, to prevent Congress from compelling the expenditure of State funds. Both in § 658(5)(A) of the UMA, and in § 7907(a) of the NCLB, as I believe it properly understood, Congress indicated that it was not concerned with preventing the expenditure of State funds when States are able to avoid the expenditure by ceasing their "participation in a voluntary Federal program." 2 U.S.C. § 658(5)(A)(i)(II).

The majority also relies on a provision of the Perkins Vocational Education Act ("Perkins Act") to argue that § 7907(a) promises that States can receive funding under the NCLB but can also refuse to comply with its requirements to the extent that the cost of compliance exceeds the amount of federal funds. Maj. op. at 13-14. As the majority notes, the relevant provision of the Perkins Act reads, as does § 7907(a), that "[n]othing in this Chapter shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Chapter," but the Perkins Act also adds, "except as required under [20 U.S.C. §§ 2322(b), 2391(b), and 2413]." 20 U.S.C. § 2306a(a). In light of the different statutory schemes, however, this distinction makes sense.

The respective funding structures of the Perkins Act and the NCLB suggest that, even if Congress intended to fully fund the Perkins Act, the same cannot be said for the NCLB. The Perkins Act allots funds to States based on the number of residents of the state in particular age groups, with the greatest amount of funding allotted based on the portion of the population between ages fifteen and nineteen, followed respectively by the population between twenty and twenty-four, and between twenty-five and sixty-five. *Id.* § 2321(a)(2). This reflects the Perkins Act's purpose which is a general, statewide one: to "develop more fully the academic and career and technical skills of secondary education students and postsecondary education students who elect to enroll in career and technical education programs." *Id.* § 2301. Needless to say, all States have significant numbers of residents within these age categories.

By contrast, the purpose of the NCLB is to "meet[] the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance." *Id.* § 6301(2). It is specifically targeted to reach the poor and disadvantaged, and funding under Title I, Part A is consequently available to States and school districts only if, and insofar as, they have low-income students or students in one of the other mentioned categories. *Id.* § 6333(c)(2). Nonetheless, the educational requirements of Title I, Part A specifically apply to all participating schools and school districts, not only to those students for whom the school districts will receive federal funding. *See id.* § 6311(b)(1)(B).

Indeed, the NCLB's funding scheme suggests that there is no correlation between the amount of federal funds a State or school district will receive and the cost of compliance with its educational requirements. In light of the different relationship between requirements and funding in the Perkins Act and the NCLB, it is unreasonable for the majority to rely on the Perkins Act to interpret § 7907(a).

In statutory analysis, context also matters. In determining whether the clear-statement rule is satisfied, a court must not let itself focus myopically on one phrase or provision. *Pennhurst*, 451 U.S. at 18 (cautioning courts against "be[ing] guided by a single sentence or member of a sentence"). Rather, in addition to the "plain language" of the provision, *id.* at 23, the court must also consider the general and specific purposes and objectives of the legislation and the policies being pursued, *id.* at 18. The court must further "look to the provisions of the whole law." *Id.* at 18

(quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975)).  Specifically, the court must not divorce one section from the remaining provisions in the statute, but rather read the entire statute as a whole:

> In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning–or ambiguity–of certain words or phrases may only become evident when placed in context. *See Brown v. Gardner*, 513 U.S. 115, 118, 115 S. Ct. 552, 130 L. Ed.2d 462 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").  It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed.2d 891 (1989).  A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569, 115 S. Ct. 1061, 131 L. Ed.2d 1 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers*, Inc., 359 U.S. 385, 389, 79 S. Ct. 818, 3 L. Ed.2d 893 (1959).

*FDA v. Brown & Williamson Tobacco Corp.*,  529 U.S. 120, 132-33 (2000).

Here, if the language in § 7907(a) that "[n]othing in this Chapter shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Chapter" meant what Plaintiffs suggest, § 7907(a) would contradict the NCLB's other requirements that States and schools districts maintain fiscal efforts to fund schools that receive the NCLB funds as well as those that do not.  In particular, the NCLB requires that a school district "may receive funds under [Title I, Part A] only if State and local funds will be used in schools served under this part to provide services that, taken as a whole, are at least comparable to services in schools that are not receiving funds under this part," 20 U.S.C. § 6321(c)(1)(A); that "either the combined fiscal effort per student or the aggregate expenditures of the agency and the State with respect to the provision of free public education by the agency" must not be "less than 90 percent of the combined fiscal effort or aggregate expenditures" for the preceding year, *id.* § 7901(a); and that States and school districts "shall use Federal funds received under [Title I, Part A] only to supplement the funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under [Title I, Part A], and not to supplant such funds," *id.* § 6321(b)(1).

Plaintiffs' interpretation of Section 7907(a) eviscerates States' and school districts' obligations under § 6321(b)(1), § 6321(c)(1)(A), and § 7901(a).  Alternatively, if "mandate" is read with the meaning I have suggested above, § 7907(a) does not contradict other provisions of the NCLB, nor does it cause the unreasonable results created by Plaintiffs' interpretation. *See Helvering v. Credit Alliance Corp.*, 316 U.S. 107, 112 (1942) (stating "[w]e should, of course, read . . . two sections [of a single statute] as consistent rather than conflicting, if that be possible"); *see also Bennett v. Spear*, 520 U.S. 154, 173 (1997) (stating a "cardinal principle . . . is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section").

## B.          *Pennhurst* **and** *Arlington*

To reach its conclusion that the NCLB did not provide clear notice to the States regarding their obligation to incur additional costs to comply with the NCLB's requirements, the majority also relies on the Supreme Court's decisions in *Pennhurst* and *Arlington*.  As for the legal holdings of those two decisions, neither supports the majority.  This court has interpreted the *Pennhurst* holding (which *Arlington* applies) as requiring "[n]othing more" than "'clear notice' to the states that funding is conditioned upon compliance with certain standards." *Cutter*, 423 F.3d at 586 (citing

*Pennhurst*, 451 U.S. at 25).  As explained *supra*, the NCLB met that standard of notice.  As for the factual circumstances in those two cases, neither is particularly helpful here.

In *Pennhurst*, the plaintiffs claimed that States receiving federal funding under the former version of the Developmentally Disabled Assistance and Bill of Rights Act affirmatively were required to provide the rights which the statute's "Bill of Rights" provision described as "'the rights of persons with developmental disabilities.'" *Pennhurst*, 451 U.S. at 13 (quoting Act of Oct. 4, 1975, § 111, 89 Stat. 486, 502 (1975) (provision repealed 1984)).  These included "'a right to appropriate treatment, services, and habilitation for such disabilities . . . in the setting that is least restrictive of the person's personal liberty.'" *Id.* (quoting Act, § 111(1), (2), 89 Stat. at 502).

The *Pennhurst* Court held that the statute's Bill of Rights "represent[s] general statements of federal policy, not newly created legal duties." *Id.* at 23.  The Court noted that the act's Bill of Rights was introduced as a set of congressional "findings respecting the rights of persons with developmental disabilities." *Id.* at 13 (quoting Act, § 111, 89 Stat. at 502).  It also pointed out that other portions of the statute, unlike the Bill of Rights provision, contained language that expressly conditioned the receipt of federal funds on compliance. *Id.* at 23.  By contrast, the Bill of Rights section provides that "[t]he treatment, services, and habilitation for a person with developmental disabilities . . . *should* be provided in the setting that is least restrictive." *Id.* at 13 (quoting Act, § 111(2), 89 Stat. at 502) (emphasis added).  The Court also noted that the statute did not empower the Department of Health and Human Services to withhold funds for failure to comply with the Bill of Rights, as it did for failure to comply with other portions of the statute. *Id.* at 23.

*Pennhurst* is not controlling because none of the Court's bases for finding the Bill of Rights provision to be "hortatory, not mandatory" are present here.  The requirements of Title I, Part A are set forth in imperative, not hortatory language. *Compare* 20 U.S.C. § 6316 ("Each local educational agency receiving funds under [Title I, Part A] shall . . . .") *with* 89 Stat. at 502 ("treatment . . . should be provided").  The NCLB's educational requirements are not introduced as mere congressional findings or voluntary goals, as was largely the case prior to the NCLB.  Here, the Secretary of Education is statutorily empowered to withhold funding from States that refuse to comply with the NCLB's educational requirements.  20 U.S.C. § 6311(g)(2) (applying to the requirement to create state standards and testing instruments); *id.* §§ 1234c, 1221(c)(1) (applying to all of the NCLB).

Moreover, the holding of the Supreme Court in *Pennhurst* was *not* that the duties created by the statute were too ambiguous to be preconditions for the receipt of federal funds, but that they were not requirements on the states at all.  The Court explained in dicta that its conclusion was simply "buttressed by the rule of statutory construction . . . that Congress must express clearly its intent to impose conditions on the grant of federal funds." *Pennhurst*, 451 U.S. at 24.  For all of these reasons, *Pennhurst* is factually distinguishable from the present case.

In *Arlington Central School District Board of Education v. Murphy*, the Supreme Court recently held that the Individuals with Disabilities in Education Act ("IDEA") does not require school districts to pay the expert witness fees incurred by parents who sue the school district to enforce compliance with the statute. 126 S. Ct. 2455, 2458 (2006). The Court reiterated that "'courts must presume that a legislature says in a statute what it means and means in a statute what it says there,'" and held that the IDEA provision that the court may award prevailing parents "'reasonable attorneys' fees as part of the costs' . . . does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts." *Id.* at 2459 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); 20 U.S.C. § 1415(i)(3)(B)).

Like *Pennhurst*, *Arlington* is not controlling here.  Title I, Part A does not merely hint that acceptance of the NCLB's funds makes States and school districts responsible to fulfill the statute's

educational requirements: it says so explicitly. None of the NCLB's educational requirements suggest, let alone state, that compliance is contingent on full federal funding. Moreover, States and school districts were aware that the NCLB's educational requirements applied even without federal funding to pay for them, because funds under Title I, Part A are available only in proportion to the number of low-income students in a school. "There was no ambiguity with respect to th[e] condition[s]" upon which States and school districts received federal funds under the NCLB and enforcing the statute's requirements does not violate the Spending Clause. *Bennett*, 470 U.S. at 666.

Unlike in *Pennhurst* and *Arlington*, we are faced with a sufficiently clear statutory text which sets forth compulsory requirements on participating States and school districts, not merely goals or statements of intent. While the NCLB is long and, at times, complex, such length and complexity does not render it ambiguous as to whether Congress meant to impose a condition on the grant of federal money.

## C.     Legislative History

Finally, Plaintiffs argue that the legislative history of § 7907(a) supports their interpretation of the provision, or at least indicates that the NCLB is ambiguous for Spending-Clause purposes. The majority concludes that the legislative history supports the latter contention, that § 7907(a) renders the NCLB ambiguous. I disagree.

Initially, and most importantly, there is no need to look at the legislative history of the NCLB. Courts may "resort to legislative history only when necessary to interpret ambiguous statutory text." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004). It is not appropriate to use legislative history to "render[] what is plain ambiguous." *Zedner v. United States*, 126 S. Ct. 1976, 1991 (2006) (Scalia, J., concurring). As explained above, no ambiguity exists in § 7907(a), especially when considered as part of the larger statutory scheme of the NCLB.

Even if it were appropriate to look to the legislative history, we should be focusing on the specific history of the NCLB. As the majority notes, § 7907(a) was first adopted as a provision of the 1994 reauthorization of the ESEA, also known as "Goals 2000." Maj. op. at 15-16; *see* Improving America's Schools Act of 1994, § 14512, 108 Stat. 3518, 3906 (originally codified at 20 U.S.C. § 8902). However, Goals 2000 was significantly different from the NCLB. As the Secretary aptly summarizes, "Goals 2000 set national goals for education improvement and provided funds to the States to aid them in developing state standards for improving education," but "these standards were intended to be voluntary." Appellee's Br. at 23-24. Unlike Goals 2000, the NCLB created compulsory educational requirements and serious consequences for failure to comply with its requirements for States that willfully volunteer to participate; in short, it is an entirely different statute. In situations like this, the Supreme Court has often cautioned against relying on the legislative history of one statute in interpreting another. *See, e.g.*, *Doe v. Chao*, 540 U.S. 614, 626-27 (2004) ("Those of us who look to legislative history have been wary about expecting to find reliable interpretive help outside the record of the statute being construed."); *Dir., Office of Workers' Comp. Programs v. Perini N. River Assocs.*, 459 U.S. 297, 320 n.29 (1983) ("Although the term 'maritime' occurs both in 28 U.S.C. § 1333(1) and in § 2(3) of the Act, these are two different statutes 'each with different legislative histories and jurisprudential interpretations over the course of decades.'") (quoting *Boudreaux v. Am. Workover, Inc.*, 680 F.2d 1034, 1050 (5th Cir. 1982)); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 n. 21 (1982) (criticizing the dissent for "us[ing] the legislative history—of a different statute—to rewrite Title IX so as to restrict its reach").

A review of some of the legislators' comments about the proposed NCLB (not Goals 2000, not the Perkins Act) confirms that Congress did *not* intend for § 7907(a) to protect participating States from having to spend their own funds to comply with the NCLB's educational requirements.

Senator Leahy noted that "the funds are far less than what will be necessary, leaving Vermont and other states with large financial gaps to fill." 147 Cong. Rec. S13365, 13378 (2001). Senator Wellstone asked, "Where are the resources to make sure that all the children in America have the same chance to do well? . . . Not in this bill. When you start talking about we have increased funding for title I, no, not in real dollar terms." *Id.* at 13368. Senator Feinstein defended the bill, but expressed the same understanding of its funding structure, explaining, "The Federal Government provides only 7 percent of total education funding, but the strength of this bill is that it tries to leverage the Federal share to prod States and school districts to make schools responsible for real results." *Id.* at 13373.[3] The bill's opponents in the House expressed similar concerns to those voiced in the Senate. *See* 147 Cong. Rec. H2396, 2403-04 (2001). Significantly, there was no discussion of changing the historic funding scheme of our nation's educational system, from largely State funds to federal funds. Thus, assuming *arguendo* that the NCLB's legislative history is even relevant in this case, it lends little or no support to Plaintiffs' argument.

### III

In conclusion, let's consider the road that Plaintiffs want to take us down. A State decides to accept NCLB funding. State and local school officials design and implement the education programs required under the NCLB. They decide how federal dollars are to be allocated between various programs. They also apparently get to determine whether one of their education programs is "fully funded" with federal dollars. So, consistent with Plaintiffs' reasoning, if they find their students failing in one program, rather than redoubling their efforts, trying something different, or asking the State or local citizenry for more funding, they can simply divert federal funds *away* from the program, declare the program "under funded," and wipe their hands (but not pay back the federal dollars). Voila, problem solved, at least for the State and local officials, if not for the struggling students.

This, of course, is exactly the *opposite* of what Congress intended to accomplish with the NCLB. 20 U.S.C. § 6301(4) (stating that one purpose of the NCLB is "holding schools, [school districts], and States accountable for improving the academic achievement of all students"). No green-tinted glasses can alter this fact.

To its credit, the majority does not accept outright Plaintiffs' interpretation of the NCLB. Yet, in finding § 7907(a) ambiguous, it concludes that Congress might have meant what Plaintiffs' say it did. I cannot agree.

Contrary to the majority's opinion, I would hold that the NCLB's requirements apply to participating States and the schools and school districts within those states, regardless of whether federal funding is sufficient to defray the entire cost of compliance. I would further hold that States' and school districts' obligations are consistent with § 7907(a), which simply prevents federal officers from transforming the NCLB from a voluntary program into a mandatory one.

My reading of § 7907(a) is supported by the plain text of the NCLB as well as its overall structure. Under the NCLB, participating States and the school districts within them must comply with extensive educational requirements if the States choose to accept federal funding. The NCLB's funding amount for a school district is dependent on congressional appropriation decisions and the proportion of at-risk students in the school district, *not* on the cost of compliance with the NCLB's educational requirements. My reading also recognizes State and local governments' long-standing

---

[3]It should be noted that Senator Kennedy stated, "In this legislation we are committing with a trigger that says, if the resources are not there, these provisions do not apply." 147 Cong. Rec. S13365, 13372 (2001). However, it is not clear, even in the context of his full remarks, to what he was referring.

responsibility for largely administrating and funding our children's education, and it properly charges Congress and State officials with knowledge of that fact. Because the NCLB's requirements are sufficiently clear, I would hold that requiring compliance with them is an appropriate exercise of congressional authority under the Spending Clause.

For all of these reasons, I respectfully dissent.